## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF WEST VIRGINIA
## AT BLUEFIELD

**S.B.,**

      Plaintiff,[1]

v.                                                              Civil Action No. <u>1:19cv773</u>

                                                 **JURY TRIAL DEMANDED**

**David R. Wilson, FPC Alderson;**
**Jerrod R. Grimes, FPC Alderson;**
**Randy Keyes, FPC Alderson;**
**SIS Broce, FPC Alderson;**
**The United States of America, and**
**Nakamoto Group, Inc.**

      Defendants.

## <u>AMENDED COMPLAINT</u>

### NATURE OF THE CASE

1.    This is a civil action in which Plaintiff, S.B., by and through her attorneys, brings claims based on the Eighth Amendment to the United States Constitution against Defendants Jerrod R. Grimes, David R. Wilson, Randy Keyes, and SIS Broce, pursuant to the legal standards set forth in *BIVENS v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971) and its progeny. Plaintiff S.B. also brings claims against the United States of America pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, *et seq.*

---

[1] These initials are a pseudonym used in this instance as the plaintiff is a victim of sexual abuse. She also has a legitimate fear of retaliation from correctional officials and/or present or former inmates for making public allegations regarding correctional officers.

2.     S.B., while an inmate in the custody of the Federal Bureau of Prisons ("BOP"), was caused to endure repeated episodes of sexual abuse and sexual battery by Captain Jerrod Grimes and sustained damages as a proximate result.

3.     S.B. brings this suit to recover for the negligent acts of the BOP employees named herein, who failed in their duty to protect her from the known risk that Defendant Grimes posed to her and to all inmates confined at FPC Alderson.

4.     As a result of the harm sustained by her while she was an inmate at FPC Alderson, S.B. suffered injuries to include: physical and emotional harm, the dignitary injury of being forced to endure sexual activity to which she did not consent, for which she had neither the legal nor volitional capacity to consent and from which she had no lawful means of escape.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this matter pursuant to U.S.C. §§ 1331 & 1346 (b)(1) as the claims in this case are brought against the United States of America under the Federal Tort Claims Act (FTCA), 28 U.S.C. 2671, *et seq.* and against the individual Defendants under the Eighth Amendment to the United States Constitution, pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971)*.

6.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1402(b), as some or all the events upon which this action is based occurred in the Southern District of West Virginia.

7.     Plaintiff has exhausted her federal tort claim administrative remedies as she filed an Administrative Tort Claim (Form 95) on February 4, 2019, with the Federal Bureau of Prisons' Mid-Atlantic Regional Office. As the six-month time period for a response

has passed without Plaintiff having received a response, her claim has effectively been denied and her administrative remedy has been exhausted.

## PARTIES

Plaintiff

8.    Plaintiff, S.B., is a thirty-one (31) year old woman currently in the custody of the BOP at FCI Tallahassee. In 2014, she was convicted of drug offenses and sentenced sixteen (16) years in federal custody.

Defendants

9.    The United States of America is a sovereign entity named herein pursuant to the FTCA.

10.    Defendant the United States of America oversees the Federal Bureau of Prisons "Bureau" or "BOP", which is responsible for the custody and care of federal inmates.

11.    Defendant David R. Wilson was, at all times relevant to this complaint, a BOP employee and, on information and belief, he is a West Virginia resident. Defendant Wilson ("Warden Wilson") was Warden of FPC Alderson, in which capacity he had full administrative responsibility for the entire institution. As Warden, Defendant Wilson had overall responsibility for facility-wide adherence to policies concerning sexually abusive behavior by FPC Alderson guards against inmates. As Warden, Wilson was responsible for compliance with BOP, FPC and PREA[2]-mandated standards. He was also responsible for supervising, training, and disciplining correctional officers at FPC Alderson. Warden Wilson is named in both his official and individual capacities.

_____

[2] Prison Rape Elimination Act, 2003.

12.    Defendant Jerrod Grimes is a convicted serial sexual abuser of BOP inmates. At all times relevant to this complaint, Jerrod Grimes ("Captain Grimes" or "Grimes") was employed by the BOP as Captain of  FPC Alderson, in which capacity he supervised all security and correctional functions of the prison and had authority to initiate inmate disciplinary proceedings and to influence inmate housing and work assignments. Captain Grimes was responsible maintaining the security and safety of inmates at FPC Alderson.

13.    Captain Grimes was, at all times relevant to this action, the staff-member responsible for monitoring potential retaliation against inmates victimized by sexual abuse or sexual harassment at FPC Alderson, pursuant to the BOP's PREA-mandated policy concerning sexually abusive behavior prevention and intervention.

14.    Associate Warden Randy Keyes is a BOP employee and, on information and belief, he is a West Virginia resident. Defendant Keyes ("Associate Warden Keyes" or "A.W. Keyes") was Associate Warden of FPC Alderson, in which capacity he had full administrative responsibility for the entire institution. As Associate Warden, Defendant Keyes was second-in-command and responsible for facility-wide adherence to policies concerning sexually abusive behavior by FPC Alderson guards against inmates. As Associate Warden, Keyes was responsible for compliance with BOP, FPC and PREA-mandated standards. He was also responsible for supervising, training, and disciplining correctional officers at FPC Alderson. The Associate Warden is also responsible for monitoring retaliation against inmates who report instances of sexually abusive behavior.  Associate Warden Keyes is named in both his official and individual capacities.

15.    Special Investigative Services Officer Broce is a BOP employee and, on information and belief, is a West Virginia resident. Defendant Broce "SIS Broce" was responsible for conducting administrative investigations within the FPC Alderson facility and referring criminal investigations to the FBI and the OIG.

16.    All defendants above were, at all times relevant to this complaint, acting under color United States law.

## FACTUAL BACKGROUND

17.    On or about January 13, 2014, S. B. entered FPC Alderson to serve a 70 month custodial sentence for drug charges.

18.    BOP policy requires the training of all employees who may have contact with inmates on how to fulfill their responsibilities under agency sexual abuse and sexual harassment prevention, detection, reporting, and response policies and procedures.

19.    Program Statement 5324.12, "Sexually Abusive Behavior Prevention and Intervention Program" is the controlling BOP policy addressing the prevention of, and intervention upon, sexually abusive behavior.

20.    Program Statement 5324.12 is disseminated agency-wide and applies to all facilities operated by the BOP and every staff member working within each correctional facility.

21.    BOP policy concerning the prevention of, and intervention upon sexually abusive behavior implements zero tolerance toward all forms of sexual activity, including sexual abuse and sexual harassment, and provides guidelines to address the prohibited and/or

illegal sexually abusive behavior involving, *inter alia,* staff perpetration against inmate victims.[3]

22.     BOP policy mandates particular staff and agency reporting duties with respect to sexually abusive behavior, including concerning incidents or possible incidents of sexual abuse or sexual harassment: it mandates that "[a]ll staff must report information concerning incidents or possible incidents of sexual abuse or sexual harassment to the Operations Lieutenant, or where appropriate, in accordance with the Program Statement 'Standards of Employee Conduct'."[4]

23.     Standards of employee conduct are mandated by BOP Program Statement 3420.11, which is also is circulated agency-wide and applies to all facilities operated by the BOP and every staff member working within each correctional facility. [5]

24.      BOP Standards of employee conduct are enumerated in Program Statement 3420.11. Each new BOP employee, contractor, and volunteer must receive and sign a form acknowledging receipt of Program Statement 3420.11.

25.     On information and belief, as BOP employees, Defendants Wilson, Grimes, Keyes, and Broce received and signed for updated versions of Program Statement 3420.11.

26.     Program Statement 3420.11 mandates that "[n]o employee shall engage in, or allow another person to engage in, sexual behavior with an inmate".[6]

---

3  Program Statement 5324.12, Sexually Abusive Behavior Prevention and Intervention Program. "Purpose and Scope" pg. 1.

4  Program Statement 5324.12, Sexually Abusive Behavior Prevention and Intervention Program, §115.61.

5  Program Statement 3420.11. Standards of Employee Conduct.

27.    As BOP employees, Defendants Wilson, Grimes, Keyes and Broce would have been aware that "[e]mployees are subject to administrative action, up to and including removal, for any inappropriate contact, sexual behavior, or relationship with inmates, regardless of whether such contact constitutes a prosecutable crime. Physical contact is not required to subject an employee to sanctions for misconduct of a sexual nature".[7]

28.    The above policies and procedures with respect to prevention, detection, reporting, and response to sexual abuse and sexual harassment were or should have been well-known to Captain Grimes, A.W. Keyes, SIS Broce, and Warden Wilson - just as they were well known to other employees and staff at FPC Alderson.

29.    Beginning in the spring and summer of 2017, Captain Grimes attended the location of S.B.'s work detail at the FPC Alderson Chapel to "hang out" while she and C.L. – who was also at that time being sexually abused by Captain Grimes – worked together there.  It was Captain Grimes' habit to "hang out" at the chapel and leer at S.B. and C.L., and it was also his habit to engage S.B. and C.L. in sexually suggestive conversations.

30.    On one such occasion, Associate Warden Keyes accompanied Grimes at the chapel and had occasion to observe Grimes' behavior.

31.    Associate Warden Keyes had a duty to intervene upon and to report this improper conduct. Instead, Associate Warden Keyes, by failing to intervene or to report this conduct by the Captain, tacitly condoned it and contributed to S.B.'s impression –

---

6  Program Statement 3420.11. Standards of Employee Conduct § 3. "Publication and Interpretation". pg. 5.

7  Program Statement 3420.11. Standards of Employee Conduct § 5. "Personal Conduct". pg. 6.

which was widely shared by both inmates and staff at FPC Alderson – that sexual abuse of certain inmates would be tolerated.

32.     The term "boundary violation" refers to conduct that crosses the line between established norms of professional relationships between BOP staff and their inmate wards. Boundary violations are well-recognized as precursors to sexual activity between prison staff and inmates. [8]

33.     A. W. Keyes – like all BOP employees - was required to document and report information concerning possible incidents of sexual abuse in accordance with BOP policies concerning sexually abusive behavior and intervention prevention and standards of employee conduct.[9]

34.     In the face of clear boundary violations between Captain Grimes and S.B., either A.W. Keyes failed to properly investigate take action to mitigate the risk of potential future sexual abuse or sexual assault Grimes may have posed to S.B. and/or any other of FPC Alderson's inmates, or he improperly failed to follow up on any investigation he did perform.

---

[8]  Cheeseman Dial, Kelly & Worley, Robert. "Crossing the Line: A Quantitative Analysis of Inmate Boundary Violators in a Southern Prison System". *American Journal of Criminal Justice*. 33. 69-84, 2008.

[9]  Program Statement 5324.12 Sexually Abusive Behavior Prevention and Intervention Program, §115.61 Staff and agency reporting duties. "All staff must report information concerning incidents or possible incidents of sexual abuse or sexual harassment to the Operations Lieutenant, or where appropriate, in accordance with the Program Statement "Standards of Employee Conduct". Program Statement 3420.11 Standards of Employee Conduct. An employee may not engage in, or allow another person to engage in, sexual behavior with an inmate. There is never any such thing as *consensual* sex between staff and inmates. Employees are subject to administrative action, up to and including removal, for any inappropriate contact, sexual behavior, or relationship with inmates, regardless of whether such contact constitutes a prosecutable crime. Physical contact is not required to subject an employee to sanctions for misconduct of a sexual nature.

## Sexual Battery by Captain Grimes: First Incident

35.    In late summer 2017, S.B. was being harassed and threatened by a fellow inmate J.S., and believed that J.S. was intent on fighting her.

36.    On October 11, 2017, S.B. was attacked by J.S. and a physical altercation between them ensued. S.B. was left with two black eyes and a number of other injuries to her face and head.

37.    On October 12, 2017, S.B. was picked up by CO Bradshaw and another unknown CO to be brought to the Administrative Building. By happenstance, they were intercepted by Warden Wilson, who instructed them to bring S.B. to the medical unit. S.B. was not brought directly to the medical unit, but rather was brought to the Administration building and questioned about her role in the fight with J.S. by acting Lt. Butler.

38.    Lt. Butler asked S.B. if she wanted to write a statement regarding the attack by J.S. and S.B. indicated that she did. She was then escorted by Lt. Butler to the Receiving and Discharge ("R&D") holding cells, where she changed out of her normal inmate clothing and into clothing reserved for inmates who were in the intake process.

39.    CO Fox entered the holding cell and took photographs of the injuries to S.B.'s face.

40.     S.B. fell asleep in the R&D holding cell and was awoken by Captain Grimes some hours later. Captain Grimes was in the process of loudly reprimanding S.B. for her involvement in the physical altercation, and when  CO Butler appeared with a clipboard with forms used by inmates to write statements, as S.B. had earlier indicated she wished

to do, Captain Grimes snapped at CO Butler and told her that S.B. did not "need" the papers to write a complaint and ordering her to "get that [paperwork] out of here".

41.     S.B. was frightened by the sudden presence of Captain Grimes in the holding cell, and feared from his demeanor that he might physically assault her. Captain Grimes, at all times relevant to this complaint outweighed S.B. by approximately 50 lbs. [10]

42.     CO Fox appeared at the cell to take more photographs on a digital camera of S.B.'s facial injuries, and Captain Grimes snatched the camera from CO Fox and scrolled through photographs that had already been taken of S.B.'s face. Captain Grimes became visibly agitated and indicated to CO Fox that the photographs were not necessary because "nobody is leaving here today".

43.     By this comment, S.B. understood that Captain Grimes refused to allow an investigation of the attack against S.B. to proceed and that he had an interest in keeping S.B. at FPC Alderson rather than allowing her to leave the compound pending an investigation into the attack against her, which is standard practice when altercations cause inmates to be placed on separation orders necessitating the transfer of inmates to other facilities where they will not be housed with inmates who have assaulted them.

44.     S.B. insisted that she would rather go to the County Jail pending an investigation of the assault and face possible transfer from FPC Alderson than be assaulted again by J.S. and possibly maimed or permanently disfigured by another altercation. S.B. also indicated that, in her view, it was too late to stop the process or a transfer since she had told Lt. Butler about the attack and CO Fox had already taken pictures of her injuries.

---

10  At the time of his arrest in Marion County, Florida on 2 April, 2018, Captain Grimes stood 5'9" and weighed 180lbs.

45.    Captain Grimes indicated that he had erased the digital images from the camera and ordered S.B. to recant her earlier version of events to Lt. Butler. He ordered her to tell Lt. Butler that  her two black eyes were the result of a fall in the shower and he indicated that he would not, under any circumstance, allow S.B. to leave FPC Alderson, because he loved her, a comment that shocked and confused S.B.

46.    Captain Grimes indicated that he would protect S.B. from further harm by J.S.

47.    S.B. was confused by the apparent risk that Captain Grimes took in telling her that he loved her and indicated that she would comply with his request that she recant her story concerning the attack by J.S.

48.    Captain Grimes arranged to have J.S. brought into the cell with S.B. and he ordered the two inmates to resolve their differences.

49.    Further investigation by CO Fox and Lt. Butler subsequently ceased.

50.     In late October of 2017, S.B. continued to fear J.S. and worried that another attack by J.S. was imminent when other inmates reported that J.S. had been near S.B.'s sleeping cubicle while she was absent during the day. S.B. was particularly concerned by rumors that J.S. was intent on having S.B. shipped away from FPC Alderson because she herself wished to have a relationship with Captain Grimes. S.B. worried that J.S. was planning on planting contraband in S.B.'s sleeping area in an effort to have S.B. removed from FPC Alderson for disciplinary violations.

51.    On 27 October, 2017, S.B. made a direct request to SIS Broce to be moved to a different housing unit, away from inmate J.S.

52.    On information and belief, inmate C.J. also sent an email to Warden Wilson expressing her concern for S.B. given J.S.'s overtly threatening conduct toward S.B.

53.    S.B. was called to the Administration building by Lt. Sykes, who sent S.B. to Captain Grimes' office.

54.    Once in Captain Grimes' office S.B. expressed her fear of a further physical altercation with J.S. to him.

55.    S.B. requested that Grimes arrange for her transfer from Alderson to another institution because she was afraid to get into another fight with J.S.

56.    During this meeting, Captain Grimes asked S.B. what she was "willing to do" for him in return for a transfer or protection from J.S.

57.    S.B. expressed that she was desperate to leave Alderson and felt it was only a matter of time before she would end up in a physical altercation with J.S.

58.    Captain Grimes ordered S.B. to stand up from where she was sitting in his office and he began to grope her breasts and forcibly kissed her. Captain Grimes told S.B. that he was going have sex with her as soon as he had an opportunity, and that he hoped that she would get pregnant as a result so that they could live as a married couple once she was released from BOP custody.

59.    This encounter was interrupted when CO Breckenridge yelled "Cap!" from outside of the office, where CO Breckenridge was standing.

60.    S.B. was shocked by this incident and reports that she was shaking and was fearful that she would get in trouble if she reported the encounter.

61.    In the days that followed, J.S. was transferred from the housing unit B-1 to housing unit B-3. S.B. feared reporting Captain Grimes because she feared being housed again with inmate J.S.

62.   S.B. was fearful of Captain Grimes because he had the power to discipline her and other inmates, and to manipulate housing and work assignments as a means of punishing them.

63.   Captain Grimes isolated S.B. in the days following the first incident of sexual abuse and told her that he would keep her safe – ostensibly from further attacks by J.S. – as long as she did not reveal their "relationship". Captain Grimes also indicated to S.B. that if she reported these and other instances of sexual abuse that she – not he – would be the one to suffer consequences, to include administrative sanctions, punishment, loss of privileges, and/or immediate transfer to a higher-security prison or to a prison with harsher conditions.

64.   This first incident was followed by a campaign of inappropriate conduct toward S.B. in the common areas of FPC Alderson outside of his office. Captain Grimes began following S.B. around the compound, appearing at her work detail during the day, and walking through the housing unit where she and other inmates slept during the night. This conduct alone should have prompted any guard at FPC Alderson who witnessed such behavior to make a report of improper activity, consistent with their responsibility to report all behavior indicating a risk of sexual misconduct between BOP employees and inmates.

65.   On one occasion following the first incident of sexual battery by Grimes, S.B. was going to the restroom at night and saw Captain Grimes sitting in the dark. S.B. could not avoid being seen by Captain Grimes, and asked him what he was doing in the unit after his shift. S.B. relates that Captain Grimes replied "I'm trying to catch my guards sleeping".

66.    On information and belief, guards at FPC Alderson made a formal complaint with respect to Captain Grimes' habit of sitting in inmate living quarters at night after his shift was over– ostensibly for the purpose of "catching [his] guards sleeping". It is not known at this time to whom this report was made, nor what came of it.

67.    At the very least, any report by guards at FPC Alderson concerning Captain Grimes' informal surveillance in the housing units at night should have prompted the Associate Warden, the Warden, and/or SIS Broce to make further inquiries concerning the risk of sexual abuse that Captain Grimes posed to inmates, given that he was accessing their sleeping quarters outside of his scheduled work hours.

68.    On one occasion, Captain Grimes isolated S.B. and told her that he would no longer protect her from physical attack by J.S. if she did not comply with his commands that she meet him in his office to have sex with him as soon as possible.

69.    S.B. continued to fear for her safety because, while they no longer slept in the same housing unit, both S.B. and J.S. were living at FPC Alderson and were not separated during the day or during mealtimes.

70.    S.B. continued to fear an attack by J.S. such that she stopped eating at the communal dining hall and began to buy her meals from the commissary and eat them alone in her living quarters where she could avoid contact with J.S.

71.    In November of 2017, S.B. spoke with both Lt. Johnson and Lt. Daniels and related to them that she was still in fear and believed that she was not safe from further attacks by J.S.

72.    Lt. Daniels and Lt. Johnson told S.B. to go discuss her concerns with SIS Broce.

73.    S.B. went to SIS Broce's office and sat down. S.B. relates that SIS Broce was dismissive of her concerns regarding J.S. and he ordered her to leave his office and to take up her concerns with the Captain.

74.    S.B. was, and indeed all inmates in BOP custody are, required to obey the commands of BOP guards.

75.    Inmates who do not obey the verbal commands of BOP guards are subject to discipline for acts of insubordination, and the punishment for disciplinary infractions for failing to obey verbal commands of BOP guards range from loss of good conduct time to placement in a segregated housing unit.

76.    Because S.B. feared that she would be subjected to further sexual abuse or raped by Captain Grimes if she went to his office alone outside the presence of other guards, S.B. demanded that SIS Broce create a record of their interaction and a record of his command that she go to Captain Grimes' office by herself. S.B. believed that SIS Broce would take steps to document or report the incident as suspicious.

77.    This request alone should have caused SIS Broce to be suspicious of the risk that Captain Grimes posed to S.B. and indeed to any inmate required to enter a room with him alone where his conduct would not be witnessed by a non-inmate. Yet, in light of what any reasonable person would view as conduct indicating a potential risk for sexual abuse of an inmate, SIS Broce took no steps to safeguard S.B. from further sexual abuse by Captain Grimes, as it was his duty to do.

### Sexual Battery by Captain Grimes: Second Incident

78.    S.B. complied with SIS Broce's order to present to Captain Grimes' office.

79.    Upon entering Captain Grimes' office, S.B. was again accosted by him.

80.     Captain Grimes groped S.B.'s breasts over her clothes.

81.      Captain Grimes attempted to shove his hand into the fly of S.B.'s prison issued pants, but when it did not fit, he thrust his hand down the front of her pants under the waistband and into her underwear.

82.     Captain Grimes attempted to penetrate her vagina with his fingers but instead swiped his fingers from the opening of her vagina upwards along the length of her labia.

83.     This instance of sexual abuse caused S.B. physical pain and mental anguish.

84.     S.B. relates that she was frozen in fear and could not speak.

85.      S.B. did not scream or yell because the only person in authority near the Captain's office had been SIS Broce, who himself had ordered her to go to Captain Grimes' office despite her protests, and who indicated that he was leaving for lunch.

86.     This instance of sexual battery against S.B. ended abruptly when Captain Grimes seemed to hear someone approaching. Before S.B. left Captain Grimes' office, he warned he had better not catch her wearing underwear under her prison-issued uniform in the future. S.B. took this threat to mean that Captain Grimes planned to further abuse and possibly sexually assault her, and that he did not want to be impeded by her underwear.

87.     This second instance of sexual abuse caused S.B. further shock and she feared that her sexual abuse by Captain Grimes would continue. S.B. also feared that his abuse of her would escalate to rape if Captain Grimes continued to have unsupervised access to her.

88.     S.B. feared escalating sexual abuse and possible future sexual assault by Grimes because she did not have sufficient physical strength relative to his, nor the freedom to fight back, to run away, to avoid him, to lawfully flee FPC Alderson, or to have her "no" respected as final.

89.    This conduct involved, variously, communicating to S.B. that the "guards stick together," and that S.B., not Grimes, would be in trouble if his abuse of her was discovered.

90.    Captain Grimes' conduct was calculated to threaten, isolate, shape, and coerce S.B. and it placed her in substantial fear that she would suffer further sexual abuse by him or further physical abuse by J.S.

91.    Subsequent to the second incident of sexual abuse against S.B., Captain Grimes told her that he no longer wanted her to visit her fiancée during family visitation days, as she had done with some regularity since she began serving her sentence.

92.    In early December, 2017, S.B. was placed on a search regimen whereby each and every time that she entered or left the visitation room she was subjected to a "visual search." A "visual search" is what is commonly known as a "strip search." S.B. was told to undress and was subjected to a visual inspection of all of her body surfaces and body cavities. According to Program Statement 5521.06 § 552.11, staff may conduct a visual search where there is reasonable belief that contraband may be concealed on the inmate's person. While contact with the public in a visitation room is indeed sufficient justification for a visual search, the fact that S.B. was now required to undergo visual searches before and after every visitation caused her to ask the female officer conducting the searches why she was suddenly being subjected to this level of surveillance.

93.    S.B. had never before had any disciplinary infraction meeting the criteria for the application of "visual search" status, and no indicia of smuggling of contraband were ever present in her history of incarceration that would identify her as a target of surveillance for investigative purposes necessitating this search status.

94.    This sudden and apparently unwarranted change in the level of intimate visual surveillance of S.B. and her naked body as a condition of visitation began only after Captain Grimes began his campaign of sexual abuse against her and demanded that she cease visitation with her fiancée, and only after she refused to cease visitation with her fiancée and other family members.

95.    S.B. asked CO Fox, a female guard, why she had been placed on this search status. CO Fox related to S.B. that the reason that she was being strip-searched before and after each visit was that Captain Grimes had ordered her to be placed on "100% visuals", meaning that she would be subjected to a strip-search 100 % of the time that she wished to visit her family.

96.    Captain Grimes used his authority to order S.B. to be subjected to unwarranted visual searches as a means of punishing her for defying his request that she cease visiting with her family.

**Retaliation at FPC Alderson and Subsequent Transfer to FCI Tallahassee
Captain Grimes Resigns and is Subsequently Indicted**

97.    On or about 21 December, 2017, Warden Wilson authorized Captain Grimes' resignation and he left FPC Alderson.

98.    Captain Jerrod Grimes was subsequently indicted. Later, he pled guilty to thirteen counts of sexual abuse of a ward and abusive sexual contact contrary to 18 U.S.C. § 2243(b) and 18 U.S.C. § 2244(a) (4).

99.    The first count of sexual assault of a ward to which Grimes entered a guilty plea dates back to November 2016, a full year before he began sexually abusing S.B.

100.   Grimes' serial sexual abuse and assault of inmates continued for more than a year and ended only when he resigned after observing victims – including S.B. - being interviewed by investigators on 21 December 2018.

101.   BOP policy requires staff to protect inmates reporting or cooperating with sexual abuse investigations from retaliation by other inmates or staff. BOP policy requires staff to immediately take appropriate steps to safeguard an inmate victim when sexually abusive behaviors have been reported, including reassignment of the alleged perpetrator to another post at the camp, placing the alleged perpetrator on administrative leave, and/or placing the alleged victim in protective custody or transferring them to another federal, state or local facility.[11]

102.   BOP policy requires each institution to designate a staff member responsible for monitoring compliance with the anti retaliation standards mandated by PREA. Until his resignation, the staff member responsible for this compliance monitoring at FPC Alderson was Captain Grimes.

103.   BOP Policy does not contemplate the use of reassignment or transfer of inmates for retaliatory purposes. BOP policy does not mandate that inmates who are victims of sexual abuse be sent to confinement at state facilities where the guards who sexually abused them are also inmates. Yet, that is what happened to S.B.

104.   On or about 7 March, 2018 S.B. was moved to the South Central Regional Jail in Charleston, West Virginia, pending an SIS investigation into a fight between her and yet another inmate at FPC Alderson, T.L.

---

[11] Program Statement 5324.12 Sexually Abusive Behavior Prevention and Intervention Program, § 115.67 "Agency protection against retaliation". Pg. 24-26.

105.    On 11 June, 2018, S.B. went to the booking area at South Central Regional Jail, and there she saw Captain Grimes looking out of his cell and directly at her from a distance of less than twenty feet.

106.    Seeing that both she and Captain Grimes were now confined at the same facility caused S.B. severe emotional distress and she reacted by yelling out and pleading with the guards who were present why they had confined her in the same correctional facility with the man who had been arrested for sexual abuse and assault of her and other inmates at Alderson.

107.    After a three-month investigation of the fight between herself and inmate T.L., S.B. was brought back to FPC Alderson for one day, and processed for transport to a transfer center in Oklahoma and eventually on to FCI Tallahassee, which houses inmates whose convictions or disciplinary infractions while incarcerated make them ineligible for Camp status. There, she was initially housed in D Unit with a cellmate who had a history of violent offences and who bore a striking resemblance to Captain Grimes.

108.    S.B. was caused to endure harassment by this inmate until she made a request directly to the Warden to be removed from that unit. Based on her request, her counselor arranged for S.B. to be moved from D North to D South.  Shortly thereafter, and for reasons not yet known, CO Pulido intervened and ordered that S.B. be moved back to D North, where her former cellmate was housed. When she complained to the unit manager, Ms. Leonard, S.B. was placed in administrative detention and housed in SHU for complaining. Less than a week later, S.B. was moved again to B Unit.

109.    S.B. was also publicly identified as a victim of sexual abuse to other inmates and staff by Lt. Paullitt, who exclaimed out loud "I know why you are here [at FCI

Tallahassee]". This occurred in the presence of Monica Lopez, who was then the facility's PREA compliance coordinator.

110.     Inmates who are transferred within the BOP system do not lose their property rights and their personal effects are transferred along with them. Shortly after arriving at FCI Tallahassee, CO Autman asked S.B. "what did you do to those people up at Alderson?" By way of explaining his question, CO Autman related that he refused to sign an acknowledgement of receipt of S.B.'s property because it had been completely destroyed. S.B. took CO Autman's question to mean that the condition of her property was not accidental. The location of S.B.'s property is still unknown, but it was not formally accepted by CO Autman, who was then in charge of receiving and inventory of inmate property at FCI Tallahassee.

### BOP's Deficient Investigation of Captain Grimes' Sexual Predation and Failure to Timely Respond to Formal Complaints

111.     Sexual activity between inmates and correctional officers is prohibited by West Virginia state law and by federal law.

112.     Sexual activity between inmates and correctional officers is also clearly prohibited by BOP policy, agency-wide.

113.     BOP policy addresses the notion of consent with respect to sexual activity between guards and inmates. Program Statement 3420.11 clearly states: "[t]here is never any such thing as *consensual* sex between staff and inmates".[12]

114.     BOP policy provides that inmates are encouraged to report allegations of sexually abusive behavior to staff at all levels, including local, regional and Central Offices.[13]

---

12  Program Statement 3420.11. Standards of Employee Conduct § 5. "Personal Conduct". pg. 6.

115.    On 29 April, 2017, an Alderson inmate, V.J.[14], drafted a formal administrative remedy request (a "BP-9") concerning an incident involving Grimes.

116.    In her BP-9 request, V.J. relates that Grimes, in plain view of several inmates in her housing unit, lost his temper and physically backed her into her living quarters, demanding that she sit down in the chair behind her.

117.    V.J. further relates that "I covered my head and had to flinch to keep my mouth from being pressed to his crotch. I felt so helpless and victimized and violated". [15]

118.    This BP-9 request continues: "PLEASE HELP ME. My rights have been violated and so has PREA."[16]

119.    Further, V.J.'s BP-9 request states: "I cannot send this complaint through this institution...We are all scared of retaliation. It is very real here. I was already warned by Admin that it was a bad idea to pursue this and that the Captain had just had 'a bad day'".[17]

120.    On 18 May, 2017, V.J. sent an electronic request through the internal email at FPC Alderson to SIS asking why this incident had not been investigated. Describing this

---

13 Program Statement 5324.12 Sexually Abusive Behavior Prevention and Intervention Program, §115.51 "Inmate Reporting". Pg. 35.

14 These initials are a pseudonym used in this instance as she is a victim of sexual misconduct who made formal complaints regarding the same. She also has a legitimate fear of retaliation from correctional officials and/or present or former inmates for making public allegations regarding correctional officers.

15  BP-9 Request for Administrative Remedy. April 29, 2017. Pg. 2.

16  BP-9 Request for Administrative Remedy. April 29, 2017. Pg. 2.

17  BP-9 Request for Administrative Remedy. April 29, 2017. Pg. 2.

incident in the course of her emailed complaint, V.J. clearly identifies "the Captain" as engaging in conduct "violating PREA".[18]

121.    V.J.'s BP-9 was received on 26 May, 2017, by regional counsel in the BOP's Mid-Atlantic Office.

122.    Four days later, on 30 May, 2017, the administrative remedy coordinator at the Mid-Atlantic Regional Office notified V.J. that her administrative remedy had been denied because she had not filed it through the institution for Warden Wilson's review.

123.    On 19 June, 2017, the BOP South Central Regional Office Legal Department received V.J.'s BP-9.

124.    Subsequent to V.J.'s formal complaints of sexually abusive conduct to SIS at FPC Alderson and to two separate regional offices, Grimes continued in his campaign of sexual abuse of inmates at FPC Alderson and sexually abused S.B. on two occasions.

## COUNT I
## Eighth Amendment: Sexual Abuse, Battery and Sexual Harassment
## (Captain Grimes)

125.    S.B. realleges and incorporates by reference the allegations of paragraphs 1-124 above.

126.    S.B. had — as do all inmates in the custody of the BOP have - a clearly established right under the Eighth Amendment to the United States Constitution not to be subjected to cruel and unusual punishment while incarcerated.

127.    Sexual abuse by a guard is not a legitimate form of punishment, it is not an ancillary component of any prison sentence, and it serves no legitimate purpose.

---

18 BP-9 Request for Administrative Remedy. April 29, 2017. Pg. 2.

128.   Captain Grimes violated S.B.'s rights by repeatedly assaulting her while she was incarcerated at FPC Alderson in November, 2017.

129.   Captain Grimes, individually, failed in his duty to provide S.B. with constitutionally safe and secure conditions of confinement by subjecting her to sexual abuse and battery.

130.   As a direct and proximate result of Captain Grimes' sexual abuse, S.B. was subjected to unnecessary and wanton pain, and emotional and physical injury, and systematic retaliation and she is entitled to redress for this serious dignitary injury and for this violation of her person.

131.   Captain Grimes' sexual abuse of S.B. amount to inhumane and outrageous conduct.

132.   All of Grimes', acts and omissions were taken while acting under color of law and in his position as a supervisor of FPC Alderson.

## COUNT II
### Eighth Amendment: Failure to Intervene
### (Warden Wilson, Associate Warden Keyes, and SIS Broce)

133.   S.B. realleges and incorporates by reference the allegations of paragraphs 1-132 above.

134.   On information and belief, Warden Wilson knew that Captain Grimes was sexually harassing and assaulting inmates at FPC Alderson. Warden Wilson had to have been apprised of the incident involving V.J. Warden Wilson, Associate Warden Keyes and SIS Broce were deliberately indifferent and even complicit in the risk faced by S.B. relative to Captain Grimes by failing to take such steps as could be reasonably expected to address the danger that he posed.

135.    The inaction of staff responsible for the custody, care, safety, and "correctional treatment" of S.B. in the face of this known risk to her safety was a direct and proximate cause of the violation of S.B.'s rights under the United States Constitution.

136.    The acts, omissions, policies, and practices of Warden Wilson, Associate Warden Keyes and SIS Broce constituted a knowing violation of S.B.'s clearly established constitutional rights.

137.    S.B.'s constitutional right not to be sexually abused or assaulted in prison was firmly established well before the BOP rules establishing mandatory procedures for handling sexual abuse cases to comply with PREA went into effect on June 24, 2015.

138.    Warden Wilson, Associate Warden Keyes and SIS Broce failed in their respective duties to provide S.B. with constitutionally safe and secure conditions of confinement by and through their deliberate indifference to the substantial risk of imminent harm posed by Captain Grimes.

139.    The policies, practices, acts, and omissions of Warden Wilson, Associate Warden Keyes and SIS Broce directly and proximately caused the violation of S.B.'s Eighth Amendment right to be free from sexual abuse and sexual battery while incarcerated.

140.    Warden Wilson, Associate Warden Keyes and SIS Broce directly and proximately caused the violation of S.B.'s rights under the Eighth Amendment of the United States Constitution by, as one example, failing to train, supervise, and discipline FPC Alderson staff and employees and/or report known or suspected sexual misconduct thereby failing to adequately prevent further constitutional violations.

141.    Warden Wilson, Associate Warden Keyes and SIS Broce directly and proximately caused the violation of S.B.'s rights under the Eighth Amendment of the United States Constitution by, as one example, failing to adhere to and /or ensure that FPC Alderson

staff followed PREA-mandated policy for responding to suspected or known instances of sexual abuse at the institution, thereby failing to adequately prevent further constitutional violations.

142.    Warden Wilson directly and proximately caused the violation of S.B.'s rights under the Eighth Amendment of the United States Constitution by, as one example, failing to ensure the coordination of departments within the facility in preventing, detecting, intervening, and responding to sexually abusive behavior.

143.    Warden Wilson, Associate Warden Keyes and SIS Broce directly and proximately caused the violation of S.B.'s rights under the Eighth Amendment of the United States Constitution by consistently failing to establish and enforce procedures for investigations of disciplinary infractions or report the same so as to limit opportunities for FPC Alderson staff to be alone with inmates unsupervised, providing the conditions of opportunity for them to have sexual contact with, or to sexually assault or rape persons in the custody of the BOP at FPC Alderson.

144.    Warden Wilson, Associate Warden Keyes and SIS Broce directly and proximately caused the violation of S.B.'s rights under the Eighth Amendment of the United States Constitution by failing to make such further inquiries or interventions as would be reasonable given their knowledge that Captain Grimes had been alone for an unknown period of time unsupervised and unobserved in his office with an inmate, thereby placing S.B. in substantial risk of imminent sexual abuse by him.

145.    By their acts and omissions, Warden Wilson, Associate Warden Keyes and SIS Broce placed S.B. in substantial risk of imminent further sexual abuse and took no immediate action to protect S.B. from further sexual abuse by Captain Grimes, as when,

for example, they failed to *formally* report or make such further inquiries as would be reasonable given their duty to act immediately in mitigating such risk.

146.    Warden Wilson, Associate Warden Keyes and SIS Broce engaged in a direct violation of S.B.'s constitutional rights by failing to take measures to protect S.B. and all inmates at FPC Alderson in the face of her actual or constructive knowledge of the risk posed by Captain Grimes, thereby subjecting them to substantial risk of imminent sexual abuse.

147.    The conduct of prison officials at FPC Alderson, which proximately caused S.B.'s injuries was of such a quality and nature as to warrant each defendant's liability for punitive damages, in accordance with applicable law.

**COUNT III**
**Federal Tort Claims Act: NEGLIGENCE**
**(United States of America)**

148.    Plaintiff realleges and incorporates paragraphs 1-147.

149.    Defendant the United States of America is responsible for the oversight of its employees, which includes officers and staff at federal correctional institutions, including United States Federal Prison Camp Alderson.

150.    Pursuant to the Federal Tort Claims Act, the United States is liable for damages caused by the negligent or wrongful acts of its employees acting within the scope of their employment, under circumstances where the United States, if a private person, would be liable in accordance with the laws of the State of West Virginia.

151.    Federal law specifically requires the BOP to "provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States" and to "provide for the protection ... of all persons charged with or convicted of offenses against the United States." 18 U.S.C. § 4042(a)(2)-(3).

152.    Defendant United States and the supervisors and employees of FPC Alderson have a duty to provide inmates with a safe and secure environment, free of dangers, including the dangers of sexual harassment and sexual assault.

153.    As a premises owner/operator, the United States has a duty to provide inmates with a reasonably safe place, which specifically includes a place reasonably free and safe from known sexual abusers and rapists and/or individuals who pose a foreseeable risk of sexual abuse or rape.

154.    Correctional officers and other prison officials at FPC Alderson have a duty to protect inmates from harm caused by correctional officers and other prison officials.

155.    Correctional officers and other prison officials at FPC Alderson have a duty to house inmates in a safe and secure manner.

156.    Correctional officers and other prison officials at FPC Alderson have a duty to protect inmates from known and obvious dangers posed by correctional officers and other prison officials.

157.    Correctional officers and other prison officials at FPC Alderson have a non-discretionary duty, pursuant to PREA, to enforce a policy of "zero-tolerance" with respect to sexual abuse of inmates by staff.

158.    Pursuant to 28 C.F.R. § 115.17(f), FPC Alderson and Warden Wilson had a non-discretionary duty to ask Captain Grimes in interviews and written self-evaluations conducted as part of his performance reviews about all incidents of alleged sexual abuse by Grimes, including but not limited to the incident described by V.J. in her administrative complaint (however technically deficient). Upon information and belief, FPC Alderson and Warden Wilson breached this non-discretionary duty.

159.    Pursuant to 28 C.F.R. § 115.31, BOP and FPC Alderson had a non-discretionary duty to train employees on how to prevent sexual abuse and sexual harassment, the right of inmates to be free from sexual abuse and harassment, the dynamics of sexual abuse and harassment, the common reactions of sexual abuse and harassment victims, and how to detect and respond to signs of threatened and actual sexual abuse. Based on the known and already alleged facts—the incident with V. J. reported to BOP administrative officials —there are two possibilities: (1) Either FPC Alderson and  the BOP failed to perform these non-discretionary duties with respect to training, or (2) Warden Wilson, Associate Warden Keyes and SIS Broce, BOP administrative officials, and other (as yet unidentified) corrections officers at FPC Alderson were carelessly inattentive to the instructions, training, and visible signs that all around them that Grimes was raping and otherwise assaulting and harassing inmates, including S.B.

160.    Pursuant to 28 C.F.R. §§ 115.31 and 115.33, BOP and FPC Alderson had a non-discretionary duty to train employees and advise inmates of their right to be free from retaliation for reporting incidents of sexual harassment and sexual abuse by corrections officers.  Based on the known and already alleged facts—the incident with V. J. reported to BOP administrative officials because of a fear of reporting within FPC Alderson, and the failure of BOP officials to "remind" the individual that she could report without fear of retaliation;—it is clear that this training either did not occur or the BOP and FPC Alderson failed to supervise employees to make sure the training was given, understood, and followed.

161.    Pursuant to 28 C.F.R. § 115.17, BOP and FPC Alderson officials have non-discretionary duties with respect to the hiring, promotion, and periodic review of their employees. Those non-discretionary duties include duties to consider, with respect to

hiring and promotion decisions, any incidents of sexual harassment, whether the inmate has engaged in sexual abuse, and whether the inmate has been convicted or civilly adjudicated of sexual abuse. Upon information and belief, with respect to Defendants the hiring and repeated promotions of Grimes, BOP and FPC Alderson officials failed to perform their non-discretionary duties.

162.    BOP supervisory officials have a duty to monitor, supervise, train, and discipline correctional staff at FPC Alderson in order to ensure that correctional staff properly perform their PREA-mandated duties so that inmates' Eighth Amendment rights are not violated.

163.    Corrections officers and supervisors have a non-discretionary duty to report suspicion of sexual abuse by corrections officers and supervisors have a non-discretionary duty to investigate such reports and to take action with respect to substantiated reports.

164.    Correctional officers at FPC Alderson knew that Captain Grimes posed an excessive and unreasonable risk to the health and safety of S.B. and that he had been sexually abusing inmates at FPC Alderson for "years." One of the following had to have occurred: (1) the correctional officers, as alleged above, breached their non-discretionary duty to report their direct   knowledge or belief of Grimes' or other officer's sexual misconduct; (2) the supervisors failed in their non-discretionary duties to investigate and take action with respect to Grimes' specific misconduct; or corrections officers and supervisors were carelessly inattentive with respect to the signs all around them.

165.   Prison officials at FPC Alderson knew or should have known that Captain Grimes should not have been permitted to have unsupervised access to inmates, including S.B., to whom he posed an excessive and unreasonable risk.

166.   As a direct result of the prison officials' breach of their non-discretionary duties or their reckless, willful, wanton and careless disregard of the obvious and known risk to inmates in improperly performing them, S.B. suffered personal injury and severe emotional distress from sexual abuse  at the hands of Grimes despite the fact that, according to at least one corrections officer, employees at FPC Alderson knew for years that Grimes was sexually abusing inmates.

### Count IV
### BACKGROUND ALLEGATIONS
### (Nakamoto Group, Inc.)

167.   Plaintiff realleges and incorporates paragraphs 1-166.

168.   Defendant Nakamoto Group, Inc. (Nakamoto) is a Delaware Corporation with its principal place of business in the State of Maryland.

169.   At all times relevant to this amended complaint, Nakamoto was the auditor for inspecting, monitoring and oversight of BOP compliance with PREA standards at FPC Alderson.

170.   The BOP contracted with Nakamoto to carry out inspections of FPC Alderson in accordance with the standards mandated by PREA. Nakamoto was contractually obliged to carry out those inspections as part of the auditing process required by PREA for the benefit of all inmates in the custody of FPC Alderson.

171.   Nakamoto contractors conducted audits of FPC Alderson in 2015 and in 2017.

172.    Nakamoto negligently performed the auditing functions under PREA and breached its contractual and/or other legal obligations as more specifically alleged below.

173.    The PREA audits conducted by Nakamoto were materially incomplete, as auditors failed to properly conduct required systematic reviews of documents held by FPC Alderson relating to sexual abuse and sexual harassment allegations and failed to properly interview inmates and/or staff that were involved in or witness to PREA violations by defendant Grimes or any other correctional officer.

174.    The failure of Nakamoto to conduct a thorough audit of FPC Alderson and investigate allegations of staff sexual misconduct allowed Grimes to stay in his position and have unfettered access to inmates, including S.B., rather than facing termination from employment or removal from his duties at FPC Alderson.

## COUNT V
## NEGLIGENCE
## (Nakamoto Group, Inc.)

175.    Plaintiff realleges and incorporates paragraphs 1-174.

176.    As mandated by PREA, the BOP conducts PREA audits at each federal prison facility once every three years.

177.    The primary purpose of the onsite phase of the PREA audit inspection is to assess the day-to-day practices used by facility staff to promote sexual safety and to prevent rape in prison.  During the onsite phase of a PREA audit, auditors are supposed to conduct a thorough examination of the entire facility, observe routine activities, interview staff and inmates, and review and retain key documents maintained by the facility.

178.    During the "onsite review" component of an audit, PREA compliance auditors are required to spend a number of days (usually three) at the facility conducting a site inspection and conducting interviews with both executive and rank-and-file staff and inmates randomly selected by the auditor during the site visit, or inmates previously identified by the facility as being fairly representative of a number of inmate social categories, such as: youthful inmates, inmates with limited English language proficiency and transgender inmates.   Finally, PREA audits are supposed to involve a careful process of documentation selection and review. These core components form the foundation of a practice-based audit methodology.

179.    At all times relevant to this complaint, PREA audits for a large number of BOP facilities were conducted by Nakamoto.

180.    As the PREA auditor for FPC Alderson, Nakamoto has owed all inmates there, including plaintiff, a duty of care to conduct its audits with ordinary skill, care, and diligence commensurate with that rendered by members of Nakamoto's profession.

181.    Prior to going onsite to a facility, Nakamoto failed to conduct a broad internet search on the audited facility to determine if there was any relevant information that might have shed light on the culture and history of the facility such as recent budgetary or staffing changes, legal action against the facility, press clippings, and other information that might inform the audit or if Nakamoto did conduct such a search it ignored the readily available information regarding longstanding and ongoing sexual misconduct at FPC Alderson.

182.    PREA Standard 115.401(h) states, that all auditors "[shall] have access to, and shall observe, all areas of the audited facilities." In order to meet the requirements in

33

this Standard, the site review portion of the onsite audit must include a thorough examination of the entire facility.

183.　Nakamoto was required to be critically engaged with critical facility functions including but not limited to intake and risk screening; activity in the housing units; bathroom and shower procedures; staffing ratios; cameras and surveillance technology deployment and use; access to reporting entities; and supervision practices at FPC Alderson.

184.　Nakamoto was required to review internal records at FPC Alderson as part of the auditing process, including but not limited to background check records; supervisory rounds logs; risk screening and intake processing records; medical files; and investigative files—including a review of a representative sample of each type of record.

185.　Nakamoto failed to use reasonable care and diligence to hire, train, and supervise its auditor staff to obtain sufficient facts to support all statements, conclusions, and findings of the audits performed at FPC Alderson.

186.　Nakamoto consistently failed to conduct thorough examinations of critical facility functions FPC Alderson.

187.　Nakamoto failed to review appropriate records and/or failed to note discrepancies, irregularities or problems that should have been readily apparent from the well known activities of defendant Grimes and/or other staff at FPC Alderson.

188.　Nakamoto generally failed to conduct its audits at FPC Alderson with the level of care imposed upon it by law and consequently breached its duty of care to the inmates there, including plaintiff in particular.

189.　Some or all of Nakamoto's breaches of its duty of care to plaintiff occurred prior to defendant Grimes' sexual misconduct against plaintiff.

190.   Had Nakamoto fulfilled its duty of care, defendant Grimes' sexual misconduct against plaintiff would not have occurred.

191.   Nakamoto knew or should have known that a failure on its part to fulfill its auditing duty of care would result in the commencement and/or continuation of sexual misconduct perpetrated by correctional officers such as defendant Grimes against female inmates such as plaintiff.

192.   As a proximate result of Nakamoto's failure to meet its duty of care, and the associated and/or consequential failure to identify and address obvious signs of endemic sexual abuse at FPC Alderson, S.B. and other female inmates at FPC Alderson sustained injuries and damages.

## COUNT VI
## BREACH OF CONTRACT
## (Nakamoto Group, Inc.)

193.   Plaintiff realleges and incorporates paragraphs 1-192.

194.   At all times pertinent to this Complaint, Nakamoto operated as an SBA 8(a) Program minority business which, because of such status, received certain preferential treatment in applying for and receiving bids on Federal government contacts.

195.   After having received federal contracts in unrelated areas of government work, Nakamoto entered into various contracts with the United States to perform audits of detention facilities (e.g., ICE facilities on the U.S. border) and to perform Prison Rape Elimination Act (PREA) audits of Bureau of Prisons correctional facilities.

196.   As a part of the aforementioned contracting process, Nakamoto had a contract to perform PREA audits at FPC Alderson.

197.    Upon information and belief, the contract regarding PREA audits for BOP correctional facilities, including FPC Alderson, have paid Nakamoto by way of consideration large sums of money measured in the millions of dollars.

198.    The purpose of the Prison Rape Elimination Act (PREA) auditing function, which the contract with Nakamoto was to provide for the BOP, was to ensure compliance with the mandates of the Prison Rape Elimination Act (PREA) 34 U.S. Code § 30301.

199.    The purpose of the Act is to "provide for the analysis of the incidence and effect of prison rape in Federal, State, and local institutions and to provide information, resources, recommendations and funding to protect individuals from prison rape."

200.    S.B. at all times relevant to the allegations herein was a federal inmate and thus an individual to be protected "from prison rape."

201.    S.B. as an inmate is a member of the class of persons the PREA auditing function was designed to protect.

202.    The contract between Nakamoto and the BOP was made and intended for the benefit of plaintiff as a member of the class definitely and clearly within the terms of the contract.

203.    Nakamoto breached the contract, including by failing to conduct appropriate and meaningful PREA audits and to make appropriate and meaningful reports which would have provided the BOP with the necessary information to take corrective action to not only fulfill the purpose of PREA "to protect individuals from prison rape" but to also help fulfill their mandated duty to  "provide for the safekeeping, care, ... of all persons charged with or convicted of offenses against the united states" and to "provide for the protection ... Of all persons charged with or convicted of offenses against the united states." under 18 U.S.C. § 4042(a)(2)-(3).

204.    As a direct and proximate result of Nakamoto's the breach of the contract between Nakamoto and the BOP, S.B. was injured and damaged as alleged hereinabove.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that this Honorable Court grant her the following relief:

1. Compensatory damages as to all Counts;

2. Punitive damages as to all Counts, excepting Count III against The United States Of America;

3. Reasonable attorneys' fees and costs; and,

4. Such other further relief as this Court deems just.

Plaintiff hereby demands a jury trial on all Counts so triable.

S.B.,
Plaintiff

*/s/Jay T. McCamic*
Jay T. McCamic, Esq. (WVSB# 2386)
McCamic Law Firm, PLLC
80 12th Street, Ste. 305
P.O. Box 151
Wheeling, WV 26003
Telephone: 304-238-9460
Fax: 304-830-5324
jay@mccamic.com

*s/L. Dante diTrapano*
L. Danté diTrapano, Esq. (WVSB# 6778)
500 Randolph Street
Charleston, WV 25302
Telephone: 304-343-4323
Fax: 304-344-3684
dditrapano@cldlaw.com
Benjamin Adams, Esq. (WSB# 11454)
badams@calwelllaw.com
Alex McLaughlin, Esq. (WVSB# 9696)
amclaughlin@calwelllaw.com

_s/Anthony I. Werner_
Anthony I. Werner, Esq. (WVSB# 5203)
John & Werner Law Offices, PLLC
Board of Trade Building, STE 200
80 - 12th Street
Wheeling, WV 26003
Telephone: 304-233-4380
Fax: 304-233-4387
awerner@johnwernerlaw.com